# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Case No. 25-cr-69-RCL** |
| | ) | |
| **STEPHEN BUSCHER,** | ) | |
| | ) | |
| | ) | |
| ***Defendant.*** | ) | |
| | ) | |
| | ) | |

## DEFENDANT STEPHEN BUSCHER'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD UNDER ASSERTED ATTORNEY-CLIENT PRIVILEGE

Defendant Stephen Buscher respectfully moves this Court to compel production of Theia Group, Inc. ("Theia") documents withheld from discovery by the government on the basis of the attorney-client privilege initially claimed by counsel for the Receiver in *FCS Advisors, LLC v. Theia Group, Inc.*, No. 1:21-cv-06995 (S.D.N.Y.), and now apparently claimed by Brevet Capital/LTS ("Brevet"). Undersigned counsel has previewed this issue several times for this Court, and has raised it multiple times with the Government.

The more than 12,000 documents at issue span the very period, and concern the very conduct, on which this prosecution is based. These documents are highly relevant to Defendant Buscher's defense, and many of them are exculpatory to Mr. Buscher. Nonetheless, the Government continues to withhold the documents from defendants because Brevet, a former creditor of Theia and a named victim in this matter, claims to assert the privilege on Theia's behalf.

1

The Court should reject that claim of privilege. *First,* Theia – the corporate client whose confidential communications with counsel the privilege was originally designed to protect – no longer exists, and Brevet's assertion of the privilege is legally invalid. *Second*, even if the privilege remained valid despite Theia's demise, Brevet lacks the power to invoke it. *Finally,* even if the privilege did exist, and Brevet were the proper party to invoke it, the Court should override that claim because equitable considerations strongly favor production.

## I. STATEMENT OF FACTS

### A. Receiver's Production Pursuant to Grand Jury Subpoena.

On August 19, 2021, Brevet, a creditor of Theia, filed a complaint asking that Theia be placed into receivership. *FCS Advisors, LLC v. Theia Group, Inc.*, No. 1:21-cv-06995 (S.D.N.Y.) (Judge P. Kevin Castel). On November 8, 2021, Judge Castel entered the Receivership Order and appointed Michael Fuqua as the federal receiver ("the Receiver"). The Order also appointed the law firm Reed Smith LLP as counsel to the Receiver.[1] After Theia was placed into receivership, the Government served grand jury subpoenas on the Receiver for documents related to Theia. Reed Smith, on behalf of the Receiver, conducted the document review and production to the grand jury pursuant to the subpoena. As part of that review, Reed Smith claimed attorney-client privilege over thousands of otherwise responsive documents, and created a privilege log reflecting those determinations.[2] The resulting Privilege Log has been produced to the defendants as part of

---

[1] Reed Smith's appointment as Receiver's counsel was conflicted from the outset. Reed Smith had a long-standing relationship as counsel to Brevet, and Brevet recommended to the receiver, Fuqua, that the receiver engage Reed Smith. Judge Castel identified the conflict and ordered that the receiver retain new, conflict-free counsel. The receiver replaced Reed Smith with new counsel, but the privilege determinations and Privilege Log adopted by the Government in this prosecution had, by then, already been made and completed by Reed Smith.

[2] Revealing what little value the Receiver placed on the privilege, Reed Smith only conducted a limited review of the documents it identified as potentially privileged. It initially conducted a partial review of documents, and that partial review is reflected in the interim Privilege Log of

discovery, but the documents themselves have been in the custody of DOJ's designated filter team since August 2023, unavailable to either the government prosecution team or the defendants. [3] These documents are the subject of this motion.

**B. Theia Does Not Exist**

The Delaware Secretary of State's records reflect that Theia has been assigned the status "Void" as of March 1, 2025. The independent members of Theia's Board of Directors resigned in June 2021. The company was placed into receivership in November 2021, and that receivership was terminated earlier this year. Theia conducts no operations, has no employees, and has no officers or directors exercising authority on its behalf. There is no representative of Theia presently invoking, defending, or asserting any privilege over Theia's communications. Theia's FCC licenses – the company's only remaining assets – were transferred from Thorian (d/b/a Theia) to LTS Systems LLC, a special purpose corporation wholly owned by Brevet, through a court approved Asset Purchase Agreement dated August 12, 2023, two days after Reed Smith's generation of its partial privilege filter review.

---

12,838 items. By October of 2025, the Receiver concluded that it did not have the resources to do further review, and the Government's filter team produced the remaining files to defendants without any review. The majority of what was produced was corrupted and therefore unreviewable, as noted in a recent motion to this Court.

[3] It is undersigned counsel's understanding that these documents are in the custody of the Government's filter team. However, Government counsel has recently indicated doubts about this and suggested that they are in the custody of Brevet. Regardless in whose custody the documents reside, the point of this motion is the same: the privilege is void and the documents should be produced. Undersigned counsel will serve a copy of this motion on counsel for Brevet.

### C. What the Privilege Log Reveals

The Privilege Log drafted by Reed Smith and produced to defendants contains 12,838 entries spanning October 23, 2017, through October 5, 2022.[4] The full log was produced to defendants by the Government as the "Fuqua Interim Privilege Log dated August 10, 2023" (FUQUA- 1661064-1729698). An analysis of the log is set forth in Exhibit A. The specific entries quoted in this motion are reproduced in Exhibit B. [5]

Even a cursory glance at the log shows the highly relevant nature of the documents withheld. For example, as set forth in Exhibit A:

- The log withholds 287 communications on which Defendant Buscher is identified as a sender, recipient, CC, or BCC. (Ex. A, Cat. 1.) Defendant Buscher cannot prepare his defense adequately without access to the communications he himself sent and received. He cannot reconstruct what he said to whom, what he was told, or what he reported, during the period at issue in this prosecution.

- The log withholds 11 communications in which Defendant Buscher is identified by name in the Message Subject but is not himself a participant; *i.e.*, communications discussing Defendant Buscher conducted outside his presence. (Ex. A, Cat. 2.) In a prosecution alleging a $250 million conspiracy, communications among the alleged conspirators discussing the Defendant out of his presence are not collateral; they bear directly on whether the conspirators were coordinating against Defendant Buscher, attributing conduct to him, or constructing a record about him.

- The log withholds five entries spanning June 13-14, 2021, which is only days after Defendant Buscher sent emails raising specific acts of potential fraud to Judge Eugene Sullivan, a member of the Theia Board of Directors and senior counsel at Freeh, Sporkin & Sullivan LLP. Defendant Buscher considers these communications with Judge Sullivan exculpatory acts of a whistleblower trying to do the right thing. The Government, on the other hand, has discounted them

---

[4] The Indictment alleges a conspiracy lasting "[f]rom at least February 3, 2017, and continuing until at least October 29, 2021." Indictment [ECF No. 1] at 25.

[5] The Privilege Log is facially defective. Even a cursory review reveals that many of the log's "descriptions" bear no relation to the subject of the document. For example, an email dated 7/21/21 from General Counsel Sullivan Jr. to Defendant Olson, Jim Hickey and Judge Sullivan with the subject line: "Responses to Buscher's Email Diatribe," is described in the log as: "Privileged email with counsel regarding review of draft lease agreement." FUQUA-1722921.

as a self-serving attempt to distance himself from his own participation in the fraud. Needless to say, any contemporaneous communications among Theia principles about Defendant Buscher's report of fraud are highly relevant to Defendant Buscher's defense.

• The log contains documents whose very subject lines indicate they are likely to be highly relevant to Defendant Buscher's defense. These include FUQUA-1722921 (7/1/21 Sullivan Jr. to Olson, Gallagher, Hickey, and Judge Sullivan, "Re: Response to Buscher's Email Diatribe"); FUQUA-1680094 (7/4/21 Gallagher to Olson, "Re: Draft email to JF and SB"); FUQUA-1723006 (7/8/21 Judge Sullivan, from his Freeh Sporkin Sullivan email address, to Olson with Gallagher and Sullivan Jr. on CC, captioned "[External] Re: BUSCHER LETTER - DRAFT ATTY CLIENT PRIV WORK PRODUCT"); FUQUA-1724764 (7/28/21 Olson to Boies Schiller Flexner LLP, "Complaint Outline - ATTY CLIENT WORK PRODUCT"); and FUQUA-1724765, a Microsoft Word document titled "PLAINTIFF BUSCHER.docx" attached to FUQUA-1724764. The communications captioned with subject-matter reference to Buscher in his CFO capacity include: FUQUA-1720552 (1/18/21 Gallagher to Olson, "Fwd: CFO Matters..."); FUQUA-1728534 (6/12/21 O'Neill to Judge Sullivan at his Freeh Sporkin Sullivan email address, "Re: [External] Re: Documents from our CFO"); and FUQUA-1704743 (7/8/21 Newfrock to Sullivan Jr. at his Freeh Sporkin Sullivan email address, Gallagher, and Hickey, "[External] CFO"). These entries are reproduced in Exhibit B.

• The log withholds 4,040 communications among Defendants Olson, Gallagher, and/or Judge Sullivan from which Defendant Buscher is excluded entirely. (Ex. A, Cat. 3.) Of these, 330 fall within the within the November 2020 through January 2021 fraud period charged in the indictment, and 612 fall within the May through August 2021 period during which Defendant Buscher was reporting fraud and seeking to expose misconduct. (*Id.*) Communications among the principal actors during the charged conduct, with the defendant excluded from those communications, are by their nature material to whether the defendant was knowledgeable of, complicit in, or excluded from the conduct charged.

• The log withholds communications referencing the specific transactions, entities, and subject matters at the center of this prosecution, including 497 entries referencing Brevet, 157 entries referencing aircraft, 65 entries referencing Theia Aviation or TAG, 57 entries referencing certifications, 55 entries referencing escrow, 30 entries referencing the company audit, 21 entries referencing Deloitte, 17 entries referencing Bulltick, 10 entries referencing PNC, 9 entries referencing Defendant Fargnoli in the subject line, and 2 entries referencing Fuqua in the subject line. (Ex. A, Cat. 4.)

These are illustrative only. Counts in Exhibit A were generated by filtering the fields of the

Privilege Log; field-based filtering may produce *de minimis* variance from manual review of all

12,838 entries. The full scope of facially relevant, and possibly exculpatory withholdings is reflected in Exhibit A or the Privilege Log itself.

In addition to the documents on the Privilege Log, there are recorded conversations that are exculpatory to Defendant Buscher which the Government has not listened to because they are being withheld as privileged. For example, on May 22, 2021, on two recorded calls, while traveling to visit Defendant Olson in a medical facility, Defendant Buscher first tells Judge Sullivan that he wants to speak with him generally about concerns he had with potential misrepresentations being made to investors and specifically about some statements made to him by Defendant Olson that needed an explanation. Judge Sullivan instructed Defendant Buscher, as an agent for the Board, to report back to him what he learned from his conversation with Defendant Olson. On May 23, 2021, in a recorded call, Defendant Buscher spoke jointly with Judge Sullivan and his son Gene Sullivan Jr., Theia's General Counsel, concerning this meeting. Defendant Buscher has copies of these conversations, and they are exculpatory to him. It is undersigned counsel's understanding that these recordings have been withheld from production on the basis of the attorney-client privilege. Although Defendant Buscher has copies of these recordings, he has not produced them to the government pending resolution of the attorney-client privilege issue. In addition, there are recorded conversations between Defendant Buscher and Theia's CEO Steve O'Neill dated 6/8/91 and 6/9/91 in which Defendant Buscher "blows the whistle" to O'Neill about potential fraud at the company. Undersigned counsel believes he produced these to the Government, but they do not appear to have been produced to defendants in discovery.

## II. ARGUMENT

The attorney-client privilege "exists for the purpose of protecting the giving of professional advice to those who can act on it." *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981). It is

"the oldest of the privileges for confidential communications known to the common law," but it is not absolute, and it is not infinite. *Id.* The privilege exists to serve a defined purpose. Where that purpose can no longer be served (because the client no longer exists, because the privilege is invoked by one to whom it was never directed, or because its enforcement would shield evidence whose disclosure due process and equitable principle require), the privilege gives way. The party asserting privilege bears the burden of establishing each of its elements as to each communication withheld. *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984); *Upjohn*, 449 U.S. at 396.

## A. The Privilege Does Not Apply Because Theia No Longer Exists.

Where a corporation has ceased to exist, and no one remains with authority to act on its behalf, the privilege does not survive in perpetuity. Under federal common law, "the weight of authority . . . holds that a dissolved or defunct corporation retains no [attorney-client] privilege." *SEC v. Carrillo Huettel LLP*, No. 13 Civ. 1735, 2015 WL 1610282, at *2 (S.D.N.Y. Apr. 8, 2015); *see also United States v. Cole*, 2021 U.S. App. LEXIS 37462, at *2-3 (6th Cir. Dec. 17, 2021) ("the majority of district courts 'hold[] that a dissolved or defunct corporation retains no privilege"), aff'd, *Cole,* 569 F. Supp. 3d at 701-702; *City of Rialto v. U.S. Dep't of Def.,* 492 F. Supp. 2d 1193, 1200 (C.D. Cal. 2007)( "[a]s there are usually no assets left and no directors, the protections of the attorney-client privilege are less meaningful to the typical dissolved corporation*"); Affiniti Colo., LLC v. Kissinger & Fellman, P.C.* 461 P.3d 606, 612-14 (Colo. App. 2019) (joining "trending majority view" that the corporate attorney-client privilege expires upon dissolution where no person remains with authority to invoke it); *see also* Restatement (Third) of the Law Governing Lawyers § 73 cmt. k. ("[w]hen a corporation or other organization has ceased to have a legal existence such that no person can act in its behalf, ordinarily the attorney-client privilege terminates.")

7

The rationale for this rule is straightforward. Unlike the interests that may be served by extending privilege beyond the death of a natural person, a dissolved corporation has no reputation to preserve and no future communications to protect or encourage. *Carrillo Huettel LLP*, 2015 WL 1610282, at *6-7; *see also Trading Technologies Int'l, Inc. v. GL Consultants, Inc.,* Nos. 05-4120, 05 C 5164 (N.D. Ill. March 14, 2012, 2012 WL 874322, at *4; Rialto*, 492 F. Supp. 2d at 1200; *Affiniti Colo., LLC* 461 P.3d at 612-14.   Moreover, "once a corporation is truly extinct, it has lost practical ability to assert the privilege." *Carrillo Huettel LLP*, 2015 WL 1610282, at *8.  "There is no current management personnel who can now assert the attorney-client privilege on behalf of the corporation." *Gilliland v. Geramita*, No. 2:05-CV-51059, 2006 WL 2642525, at *3 (W.D. Pa. Sept. 14, 2006).  Finally, "limiting the duration of the attorney-client privilege to the life of a corporation is consistent with the principle that the privilege is to be construed narrowly because it withholds relevant information from the judicial process." *Carrillo Huettel LLP*, 2015 WL 1610282, at *8; *see also City of Rialto*, 492 F. Supp. 2d at 1200; *Gilliland*, 2006 WL 2642525, at *4.

Theia no longer exists. Under Delaware law, the consequence of a void status is that "all powers conferred by law upon the corporation are declared inoperative." 8 Del. C. § 510. Accordingly, Theia's corporate powers (including the power to retain counsel, to direct counsel, to hold privilege, and to assert privilege) are inoperative by Delaware statute. There is no corporate Theia presently capable of doing any of the things the privilege presupposes a client can do.

**B.  Even If Theia's Privilege Continued to Exist Independently of the Company, Brevet Lacks the Power to Invoke it.**

The attorney-client privilege exists to "promot[e] full and frank communications between attorneys and their clients," whether those clients are individuals or corporations. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985) (citing *Upjohn Co. v. United*

*States*, 449 U.S. 383) (1981)).    However, application of the attorney-client privilege to corporations, presents "special problems:"

> As an inanimate entity, a corporation must act through agents. A corporation cannot speak directly to its lawyers. Similarly, it cannot directly waive the privilege when disclosure is in its best interest. Each of these actions must necessarily be undertaken *by individuals empowered to act on behalf of the corporation.*

*Id.* (emphasis added).  In the case of an extant, solvent corporation, the power to exercise or waive the privilege belongs to the corporation's management, who must exercise the privilege "in a manner consistent with their fiduciary duty to act in the best interests of the corporation, and not of themselves as individuals." *Id*. at 348-49.  In *Weintraub,* the Supreme Court held that in the case of a corporation in bankruptcy, the bankruptcy trustee controls the privilege because the trustee exercises "wide-ranging management authority over the debtor." *Id.* at 352.   In that position, the trustee bears the same fiduciary duty as management to exercise the privilege in accord with the interests of the corporation's stakeholders. *Id*. at 355.

Here, Brevet does not exercise management authority over Theia. *First,* as discussed above, Theia no longer exists.  *Second*, even when Theia existed, Brevet's only relationship with the company was as a creditor*,* and now, as the purchaser of a remaining asset.  Brevet does not hold – and never has held – "management authority" over Theia.

And Brevet does not owe – and never has owed – a fiduciary duty to Theia.  The *Weintraub* Court held, in part, that the trustee holds the power to exercise the privilege, rather than the bankrupt corporation's directors, because the directors' ability to exercise that power for their own benefit, rather than the corporation's, could frustrate the trustee's ability to advance the interests

of the company's shareholders and creditors, particularly where the interests of the corporation and management diverge.[6] *Id.* at 353-54.

Here, the government has identified Brevet – a former creditor of Theia – as a victim of the alleged fraud perpetrated by the defendants.  It was a key party in the transactions that are at the heart of the prosecution. Its interests, which are adverse to Defendant Buscher, are likely to be represented through employee witnesses at trial.  Allowing a privilege created to protect a corporate client in seeking and receiving legal advice in the ordinary course of its operations to then be repurposed, after that client's dissolution, to shield documents from disclosure in a criminal prosecution by an ostensible victim, whose interests are adverse to the defendants, would be perverse and should not be permitted.

**C.  Where the Privilege's Purpose Has Evaporated, Equitable Principles Counsel Against Its Enforcement, Particularly Where Material Exculpatory Evidence Is at Stake,**

The attorney-client privilege is "narrowly construed" against its proponent because it operates "in derogation of the search for truth." *In re Sealed Case*, 676 F.2d 793, 807 n.44 (D.C. Cir. 1982); *see also Fisher v. United States*, 425 U.S. 391, 403 (1976) (the privilege "applies only where necessary to achieve its purpose"). A court asked to enforce the privilege must therefore consider, as a threshold matter, whether enforcement still serves any of the purposes the privilege exists to advance. Where it does not, the privilege gives way.  This is especially true in the criminal defense context. The constitutional protections that govern criminal prosecutions, including the

---

[6] "In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors.  It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege, and therefore to control access to the corporation's legal files. To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets." *Weintraub*, 471 U.S. at 353.

Due Process Clause and the disclosure obligations imposed by *Brady v. Maryland*, 373 U.S. 83, 87 (1963), place a heavy thumb on the side of disclosure where the materials in question are favorable to the accused.

Here, equitable considerations strongly favor production. Theia is void as a matter of Delaware law – it simply does not exist. It has no goodwill to maintain, no reputation to protect, no operations to safeguard, no employees whose future candor with counsel must be secured, no assets the privilege might shield, and no person empowered to act on its behalf. *See Cole*, 569 F. Supp. 3d at 701-702; *City of Rialto*, 492 F. Supp. 2d at 1200. Each of the rationales for the privilege the *Carrillo Huettel* court identified is not merely weakened on the facts here, it is absent altogether. Theia is what *Affiniti* described: "A corporation that has been dissolved and has no management to act on its behalf is, in effect, an empty shell." *Affiniti Colo., LLC v. Kissinger & Fellman, P.C.*, 461 P.3d 606, 614 (Colo. App. 2019). Simply purchasing the remaining assets from that empty shell should not confer on Brevet (or any other successor) the right to claim Theia's attorney-client privilege over Theia documents. This is especially true where, as here, the documents being withheld by the claim of privilege are on their face highly relevant and exculpatory.

## IV. CONCLUSION

For the foregoing reasons, Defendant Buscher respectfully requests that this Court enter an order:

1. **Compelling production.** Ordering the Government to produce all documents withheld on the basis of the attorney-client privilege because that privilege did not survive the dissolution of the corporate client and cannot be enforced on the facts presented;

2. **In camera review in the alternative.** In the alternative, conducting in camera review of the documents withheld on the Privilege Log to identify exculpatory

materials whose disclosure is required by equitable principle and due process, including, at minimum:

a.  all entries dated November 1, 2020, through January 31, 2021 (the period of the conduct charged in the indictment);

b.  all entries dated May 1, 2021, through November 8, 2021 (the period of Defendant Buscher's reporting fraud and until receivership); and

c.  all entries on the Privilege Log which the Court, in its equitable discretion, finds bear on the charges in the Indictment, specifically recognizing that the Indictment alleges a scheme to defraud that preceded Defendant Buscher's association with Theia by years and continued after his resignation, specifically alleging the first fraudulent investor solicitation in January 2017 (Indictment ¶ 14) and charging Defendant Buscher with a conspiracy occurring "[f]rom at least February 3, 2017, and continuing until at least October 29, 2021" (Indictment ¶¶ 86, 90).

Respectfully submitted,


_____/s/_____
Whitney Ellerman (D.C. Bar No. 420486)
Paul F. Enzinna (D.C. Bar No. 421819)
Ellerman Enzinna Levy PLLC
1050 30th Street, N.W.
Washington, DC 20007
+1 202.753.5553 (o)
+1 202.415.1543 (c)
wellerman@eellaw.com
penzinna@eellaw.com


*Counsel for Defendant Stephen Buscher*

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on May 5, 2026, a copy of the foregoing Defendant Buscher's Motion to Compel was filed using the CM/ECF system, which will then send notification of such filing to all counsel of record.   It was also served by electronic mail and first-class U.S. Mail on counsel to Brevet Capital:

Nicole H. Sprinzen
Cozen O'Connor
2100 M Street, NW
Suite 500
Washington, DC 20036
nsprinzen@cozen.com

Dated:   May 5, 2026                              Respectfully submitted,


_____/s/_____
Whitney C. Ellerman (D.C. Bar No. 420486)
Ellerman Enzinna Levy PLLC
1050 30th Street, NW
Washington, DC 20007
202.753.5553
wellerman@eellaw.com

*Counsel for Defendant Stephen Buscher*

13